OPINION OF THE COURT
Arthur S. Hirsch, J.
In the early 1970’s, New York City was faced with the immediate and pressing need for facilities to be used as day care centers. As an outgrowth of its arid financial condition, the city, unable to build its own, arranged with private builders on a competitive bidding basis for them to construct day care centers to the specifications of the city. The builder and the city would enter into a lease agreement which provided for the construction and, upon completion, for the occupancy of the entire premises for an extended time.
In this setting, the instant action arose. Plaintiff Bet Construction Corporation (Bet) built a day care center on Lefferts Avenue in Brooklyn pursuant to a lease agreement dated May 13, 1971, prepared by the Corporation Counsel with the imprimatur of the Board of Estimate of the City of New York. The defendant, the City of New York (city), by its Department of Social Services, occupied the premises at a rental of $7,000 per month qnd has been in possession since October, 1972. For four years, the agreed rental was paid, but in 1976, when the city’s financial problems became serious, it wrote to Bet (as well as together similar landlords)\explaining its financial difficulties and informing the owner that the rental of the day care center was to be reduced. In response, Bet, allegedly because of its own mortgage commitments, did not accept the voluntary reductions, insisting that the city comply with its lease contract.
Significantly, it was at this point in time, August, 1976, a full four years after occupancy and after its rent reduction proposal was rejected, that the defendant city made a thorough inspection of the premises and ceased to pay rental for the Lefferts Avenue Day Care Center. It gave by way of explanation the lease was invalid because of certain substantive branches by the landlord which had been discovered at that late date, particularly in regard to the installation at the time of construction of a play roof surface which did not comply with the original specifications. The city has refused to pay rent for the premises since 1976 to the present date, *1104 although the plaintiff has denied that it had violated any of its obligations under the lease.
The result is the present action, another of the plethora of cases in which the city has been sued for failure to pay rent for day care centers. Plaintiff Bet is suing to recover rent for 13 months in the amount of $91,000.
Defendant’s amended answer set forth a number of defenses and counterclaims including: unconscionability as to the amount of the rent; lack of approbation of the lease by the Comptroller; rent excessive and unreasonable; exorbitant profit on the investment; failure of plaintiff to install certain items in accordance with the specifications and, finally, damages by reason of deprivation of the full use and enjoyment of the premises.
Defendant’s overriding goal, obviously, was to have the rent of the Lefferts Avenue Center reduced, but their unstated defense of "financial hardship” is untenable (Petinelli Elec. Co. v Board of Educ., 56 AD2d 520, affd 43 NY2d 760) and was not pursued. It would appear that the efficacy of a number of the defendant’s other defenses is equally untenable, the courts having earlier rejected defendant’s supportive arguments (see Euclid Ave. Assoc. v City of New York, 64 AD2d 550; Lexington Realty Assn. v City of New York, NYLJ, Aug. 23, 1978, p 6, col 2; Barry v City of New York, 175 Misc 712, affd 261 App Div 957), and so, the city did not seriously support these defenses with convincing proof. Rather, it concentrated its effort at trial on the issue of its alleged damages for deprivation of the use of the play roof area and the failure on the part of the landlord to install certain items in violation of the requirements in the specifications.
As an afterthought, defendant moved at trial to amend its answer to include a setoff against rent for failure of the landlord Bet to paint the premises pursuant to the terms of the lease. In regard to this trial motion, the subject lease requires the landlord to paint at the end of five years. At the prescribed five years, however, the city was not paying rent and had not paid for a period of a year. A tenant who refuses to pay rent to the landlord for that extended length of time is hardly in a position to demand that the landlord paint the premises. This probably accounts for the fact that the city did not exercise its right pursuant to the lease to give the landlord written notice, 30 days thereafter to have the premises painted, deducting the costs from the rent. Bet has indicated *1105 that they are perfectly willing to paint just as soon as the city pays the rent allegedly owed. For these reasons, defendant’s trial motion, which the court considers to be a mere diversion, is herewith denied.
To justify its withholding of all the rent (see Fifth Ave. Estates v Scull, 42 Misc 2d 1052) and, equally important, to win a permanent rent reduction, the city faces the task of proving partial eviction or, alternatively, showing that the lease was invalid because of plaintiffs violation of its terms.
PARTIAL EVICTION THEORY
This issue necessitated testimony focused primarily on proving that the landlord’s willful act in installing inferior quality interlocking tiles on the play roof curtailed defendant’s use and enjoyment of the area, which constituted a partial eviction, actual or constructive (Barash v Pennsylvania Term. Real Estate Corp., 26 NY2d 77). It was not alleged that plaintiff physically ousted or excluded defendant, a necessary element in an actual eviction (Jackson v Paterno, 58 Misc 201, 204, affd 128 App Div 474; Meerbaum v Crepes D’Asie, 81 Misc 2d 842, 845), therefore, only constructive eviction remains open as a viable approach.
In support thereof, defendant offered testimony by a city engineer who had inspected the premises and found sufficient buckling of the surface tiles to create a tripping hazard to young children at play. Additionally, the tiles had not retained a level surface, which allowed pools of rainwater to form, thereby drastically restricting the area utilization.
Plaintiff countered with testimony by a teacher employed in the day care center who attested to the fact that the play roof was in daily use during clement weather and had been since the opening of the center. Recent photographs of the play roof area offered by plaintiff showed some slight buckling of the tile, but more decisively, showed children at play. This graphic evidence eliminated the effectiveness of a partial constructive eviction claim which would necessitate not only a showing of material deprivation of the beneficial use and enjoyment of the premises, but proof that the tenant abandoned a substantial part of the premises (Union Dime Sav. Bank v Frohlich, 57 AD2d 862 [abandonment]; Zamzok v 650 Park Ave., 80 Misc 2d 573 [partial eviction]). Furthermore, by remaining in possession long after the occurrence of the condition on which defendant based its claim it waived its right to abandon the *1106 premises because of an alleged eviction (Waldene Realty Co. v Pfalzer, 223 App Div 787).
INVALIDITY OF LEASE
While the evidence did not support defendant’s eviction theory, it did partially substantiate the city’s claim that the roof play surface had defects. However, it was also revealed that the roof is being used daily six years after completion. Inasmuch as the lease places the obligation to make repairs upon the tenant, the city devised a supplemental attack, to wit, challenging the lease as a result of the noncompliance by the landlord with building construction specifications. Ostensibly, this would nullify the lease, putting the city in a prepotent position regarding renegotiation of the rental.
An examination of the lease discloses the specific requirement that the landlord "install Mitchell Safety Surf or equivalent on the roof play area.” It is undisputed that Mitchell Safety Surf tiling was not used. Defendant interjected an argument on this issue in which it takes the position that the Board of Estimate resolution rider, which has no mention of the use of an equivalent to Mitchell Safety Surf tiling is controlling. The court considers this but another diversion. A perusal of the lease satisfactorily quells defendant’s argument, for the lease instrument permits the installation of the "equivalent” of Mitchell Safety Surf, and further provides that although the resolution will govern if there is a conflict with the terms of the lease, the lease will govern where the lease contains provisions not set forth in the resolution, in this instance, the word "equivalent”.
The pivotal issue, therefore, is whether the installed tile was equal to or comparable to Mitchell Safety Surf tile. Defendant’s expert testified to the fact that the one-half-inch interlocking tile on the roof was vastly inferior to the one inch Mitchell Safety Surf tile. To support the city’s claim of noncompliance, a sample of each tile was introduced as evidence and one could see with the naked eye the difference between the two surfaces. It would appear, however, that there is "more here than meets the eye.”
Plaintiff testified that, subsequent to the execution of the lease, the city had specifically denounced the use of Mitchell Safety Surf. An interdepartmental memorandum, written in August, 1971, by a city deputy director, the subject of which was Mitchell Safety Surf play area surfacing, was offered in *1107 evidence. This memorandum had been distributed to various persons in the Social Services Department involved in day care center building and it stated that Mitchell Safety Surf had been found by the city to be completely unsatisfactory and unacceptable for use as play surface in day care centers. A letter written by a staff architect employed by the city, dated August 14, 1973, indicates that as late as that date, the city was still sending communications disapproving Mitchell Safety Surf. The authors of both documents were called by plaintiff to testify and, in what hopefully is not typical bureaucratic inefficiency, both men stated that they had indeed written and circulated the directives but had done so because they did not have correct information about the tile. They had evidently not been very thorough in their investigation of the material specified in their contracts and, admittedly, had not been aware that in 1972 and 1973 the manufacturer of the play surface had two products on the market, "Mitchell Play Surf’ and "Mitchell Safety Surf’. Their directives condemning the "Safety Surf’ were really meant to condemn "Play Surf’. Unfortunately, the builders of day care centers are not required to be clairvoyant.
Plaintiff insists that, after becoming aware of the city’s disapproval of Mitchell Safety Surf, he showed the substitute tile to the city’s site inspectors and obtained their verbal approval, while defendant denies this and asserts that even were it true, the inspectors cannot bind the city with consent that is in opposition to the provision requirements of a written document. No inspector testified in support or rebuttal, but the fact is that the city did accept and approve the construction as evidenced by the Department of Social Services certification that the building had been completed in accordance with the terms of the lease. More to the point, it moved in and took possession of the building.
The final question to evolve on the issue of illegality of the lease is whether the city, by its acceptance and occupation of the building, waived the issue of noncompliance with the specifications. The main thrust of the city’s argument on this subject is that it was not aware of the inferiority of the tile until four years after it took possession, when the tiles began to show defects.
If the court were to accept the city’s position, it must ignore the realities of the role and power of building inspectors. A builder has no alternative but to comply with the direction of *1108 the site inspector if he expects to have final approval of his building. It would be grossly unfair for the city to require complete acquiescence by the builder to the decisions of city inspectors and on the other hand for it to be relieved of responsibility if, at a later date, the city does not like the decisions of its own inspectors. The law is not one-sided. The construction of the LefFerts Avenue Day Care Center received final approval by the city. The comedy of errors regarding the city’s disapproval of Mitchell Safety Surf further compounds their liability. As a consequence, the city must be charged with knowledge as to the quality of the play surface installed. An insuperable barrier to their claim was created once they moved in and took possession, and they no longer can cry "foul”. No legal basis has been presented to relieve defendant from paying the rent on the premises it continues to fully occupy.
The same rationale may be applied to the defendant’s claim that certain other items were not constructed in accordance with the specifications and are not satisfactory to the city. The defendant has waived any rights as against the plaintiff by waiting the inordinate and unreasonable length of time since its taking possession in 1972. It would have been appropriate for objections to be made prior to occupancy and not at this late date.
Finally, as to defendant’s contention that it is entitled to damages for the disturbance or interference in the use of the play roof area, the court finds this claim to be without merit. The evidence adduced at trial showed the slight raising of a few of the interlocking tiles to be a minor defect, easily repaired by the city. No proof was given to support any other interference or inconvenience in the use of the roof by the children and it is obvious to this court that the discovery of the insignificant defect would not have come to light had the city not been thwarted in its demand for a financial hardship rent reduction. This court must not be placed in a position of allowing its real concern for the city’s financial situation to take precedence over the concepts and principles of law by which all must abide.
Judgment granted to plaintiff for $91,000 plus interest.